# Stoutz, Admr., &c., v. Huger et al.

*Bill in Equity to Set Aside Fraudulent Conveyance.*

1. *Appeal by administrator de bonis non from decree against former administrator.*—Where a bill is filed by an administrator, with the will annexed, which, on the hearing, is dismissed by the chancery court, and afterwards, within the period for taking an appeal, an application in writing is made to the register, by a different person from the original complainant, for the allowance of an appeal to the supreme court to the applicant as administrator of the decedent's estate, with the will annexed, and letters of administration as such,

[Stoutz, Admr., &c., v. Huger.]

are exhibited and filed with the application, together with security for costs of the appeal; the appeal, (according to the opinion of a majority of the court) is properly taken.

2. *Fraudulent conveyance—statute of limitations—*The statutes of limitations of three and six years are no defense to a bill in equity to set aside a conveyance of land as in fraud of creditors.

3. *Same.—*A bill in equity to set aside a conveyance of land as in fraud of creditors, is a proceeding to enforce a constructive trust in the land to which the statute of limitations of ten years is a good defense, if the case is not exempted from its operation by fraudulent concealment of the facts, or some other saving of the statute.

4. *Fraudulent grantee cannot plead statute of limitations as defense to attacking creditor's debt —*When a bill is filed by a judgment creditor to set aside an alleged fraudulent conveyance, the alleged fraudulent grantee cannot interpose the defense of the statute of limitations to the original debt of the complainant against the grantor.

5. *Bill by subsequent creditor to set aside fraudulent conveyance.—* Where a bill to set aside a conveyance to the debtor's wife as in fraud of creditors is brought by one who has become a creditor subsequent to the conveyance, and alleging that the debtor husband paid the purchase money, the burden is on complainant, of proving that the purchase price was paid by the debtor with intent to place the money beyond reach of his creditors.

6. *Property purchased by insolvent husband and title put in wife may be subjected to his debts.—*Where on a bill filed by a creditor of the husband to set aside a conveyance of property, purchased by him, and made to the wife at his instance, it appeared that, shortly before the purchase and conveyance to the wife, judgment had been rendered against the husband for $8,257.08 on a debt of five years' standing, and also for $3,773.38 on another debt, executions on both of which were returned unsatisfied; that his income was decreasing when the purchase was made; that of the purchase price of $10,000 be paid from time to time all but $2,000, which was paid by the wife with borrowed money; the conveyance was in fraud of creditors

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. W. H. TAYLOE.

The bill in this case was filed December 26th, 1890, by the appellant, R. W. Stoutz, as administrator of the estate of Charles Werborn, deceased, against the appellees, and sought to subject to the satisfaction of a judgment recovered by Charles Werborn against the respondent, D. E. Huger, certain real property in the city of Mobile. The facts of the case are set forth at length in the opinion.

On the final submission of the cause, upon the pleadings and proof, the chancellor decreed that the com-

plainant was not entitled to the relief prayed for, and ordered his bill dismissed. The complainant prosecutes the appeal from said decree, and assigns the same as error.

FREDERICK G. BROMBERG, for the appellants.—1. D. E. Huger was insolvent when the purchase of the house, and the first payment thereon were made. Insolvency may be shown by unsatisfied *fi. fas.* 1 Whart. Ev., § 834. And is presumed to continue until the contrary is shown. 2 Whart. Ev., § 1289. This court holds that "insolvency means an insufficiency of assets to pay debts."—*Smith v. Collins*, 10 So. Rep., 340. The record shows this to have been the condition of D. E. Huger from as far back as 1870 continuously until the present time.

2. D. E. Huger admits that he made the first payment of $3,000. The value of the property purchased is conceded to be more than $2,000, and all of said value in excess of that sum is subject to appellant's demand if D. E. Huger was insolvent at the time of purchase. The transcripts of the records of the courts show that he was so insolvent.

3. There is no proof that the additional payments of $7,000 were made by any one but D. E. Huger. The presumption is that they were. The burden is upon Mrs. Huger to show distinctly how she got the $2,000 claimed to have been paid by her upon the house, because there is no evidence tending to show that she ever had a separate estate of any kind. It is true Mr. Duncan deposes that he paid the last $2,000 of the purchase money of the house, but he says he was repaid by Mrs. Huger.—*Booker v. Waller*, 81 Ala. 561. In view of the fact of the insolvency of the husband at the time of purchase and his continuously remaining insolvent, the taking of the conveyance in the wife's name must be presumed to have been with fraudulent intent. Such being the case the conveyance is fraudulent as to subsequent creditors.—*Lammons v. Allen*, 88 Ala. 417; *Gilliland v. Fenn*, 90 id., 230; *Dickson v. McLarney* 97 Ala. 383.

4. The payments upon the house were in the nature of gifts to the wife by the husband, and can be reached in equity.—*Ware v. Hamilton Brown Shoe Co.*, 92 Ala.

[Stoutz, Admr., &c., v. Huger.]

150; *Seals v. Robinson*, 75 Ala. 370; *Pickett v. Pipkin*, 64 id., 526. The inference of fraudulent intent arises from the circumstances of the case. Note to *Jenkins v. Clement*, 14 Am. Dec. 707.

5. There is a presumption against the appellees arising from their relation as husband and wife which must be overcome by *affirmative proof.—Hamil v. Augustine*, 46 N. W. Rep. 1113; Wait, Fraud. Convey. § 300; *Fisher v. Herron*, 34 N. W. Rep. 365; *Seitz v. Mitchell*, 94 U. S. 582.

6. The judgments in evidence against the appellee, D. E. Huger, are all existing, unsatisfied judgments at this day.

OVERALL, BESTER & GRAY for the appellees, on motion to dismiss appeal.—The bill was filed in the name of Charles F. C. Peters, as the administrator of Charles Werborn, and the case was tried and a decree rendered while he was thus such administrator, dismissing the bill. The decree was rendered on the 22d of January, 1892. On the 6th day of December, 1892, Richard W. Stoutz as administrator, applied for and obtained an appeal. The pleadings and all the proceedings in the court below only show Charles F. G. Peters, as administrator, as the complainant. In this condition of the cause after final decree and the adjournment of court, if appealed, it can only be revived in the Supreme Court. Supreme Court Rule 36, page 805 of Code. The Code provides for reviving a suit after the death of the plaintiff or complainant, but these provisions apply to causes still proceeding and not yet finished in the courts below. Code section 2265, 2603; Chancery Rule 102, page 829 of Code.

On questions raised by appeal.—First, the debt due complainant was incurred after the conveyance was made to Mrs. Huger, and after it was placed on record.—Wait on Fraudulent Conveyances and Creditor's Bills, § 106; *Monroe v. Smith*, 79 Pa. State, 459; Code of Alabama, § 1797, § 1798; *Seals v. Robinson & Co.*, 75 Ala., 364; *Kirksey v. Snedecor*, 60 Ala., 192; *Baker v. Gilman*, 52 Barb. (N. Y.), 39.

Second. Col. Huger did not pay for the property, but Mrs. Huger did, out of her own means. If not

all, at least a large portion of the purchase money was paid by her.

ON MOTION TO DISMISS APPEAL.

HEAD, J.—A bill was filed by Chas. F. G. Peters, as administrator with the will annexed of Charles Werborn, deceased, against the appellees to set aside a conveyance of land as fraudulent and subject the land to the payment of a judgment which complainant's testator recovered in life, against D. E. Huger, one of the appellees. On January 22d, 1892, on hearing on the merits, the chancellor rendered a decree dismissing the bill. On December 6, 1892, Richard W. Stoutz filed with the register in the cause, an application as follows : "Comes Richard W. Stoutz and exhibits and files herewith his letters as administrator of the estate of Charles Werborn, deceased, and as such administrator, prays an appeal to the Supreme Court of Alabama, from a final decree rendered in the above entitled cause, on the 22d day of January, 1892, returnable on the first Monday in January, 1893. (Signed) Richard W. Stoutz, Admr." He filed with this formal letters of administration, *cum test. annexo* upon said estate issued to him, on September 24th, 1892, by the Judge of Probate of Mobile county. He also filed security for costs of appeal. A motion is made in this court to dismiss the appeal on the ground that the appellant had no authority to sue it out. We have stated all the record shows touching Stoutz's connection with the case.

Appeals are entirely of statutory creation. Being remedial, the statutes creating and regulating them will be liberally construed, but authority for the appeal in every case, must be found in the statute.—*May v. Courtney*, 47 Ala., 185. The laws to which we must have recourse are as follows : Section 3611 of the Code provides, that from any final judgment or decree  * * * an appeal lies to the Supreme Court  * * * on the application of *either party, or his personal representatives*. Sections 3612 to 3618, inclusive, confer the right of appeal from certain interlocutory orders, from orders sustaining or dissolving injunctions, appointing receivers, denying remedial writs, and from abolished courts. Chapter 2, beginning with section 3619, regulates the

[Stoutz, Admr., &c., v. Huger.]

time within which appeals may be taken, and the man-
ner of taking and presenting them. Section 3638 pro-
vides, "when either party to a judgment or decree dies
after judgment or decree rendered, and before appeal
taken thereon, an appeal may be presented in the name
of, or against the legal representative of the deceased,
on producing satisfactory evidence to the clerk, judge
of probate or register of the death of the party, and
grant of letters testamentary or of administration."
Rule 86, Supreme Court practice, provides that any
complainant or defendant in a cause in which a decree
or order final may have been rendered, may appeal to
the Supreme Court in the name of himself and all the
other complainants or defendants to the decree. Code,
page 826. The Code makes ample provision for the re-
vivor of causes pending, as well in this court, as in the
lower courts. Code, §§ 3462, 3656, and other pro-
visions.

Upon due consideration of the foregoing provisions,
in view of their remedial nature and the liberality with
which they should be construed to advance the objects
the law intended, a majority of the court are of the
opinion that the spirit of the provisions gives the ap-
pellant the right of appeal, under the facts of this case,
and the motion to dismiss the appeal is accordingly
overruled.

## On the questions raised by the appeal.

HEAD, J.—The statutes of limitations of three and
six years are not applicable to this case. It is a proceed-
ing to enforce a constructive trust in lands, to which the
statute of ten years is a good defense, if the case is not
excepted from its operation by fraudulent concealment
of the facts, or some other saving of the statute.—*Lock-
ard v. Nash*, 64 Ala. 385 and cases cited. We are not
under the necessity of deciding whether the relief sought
is barred by the last named statute, for the reason that
the defendants have not interposed that defense. The
defense of the statute of limitations to the original
cause of action of the creditor against the debtor was
personal to the debtor; and in this case, the debtor who
occupies substantially the position of an alleged fraudu-
lent grantor, having suffered judgment against him at
the suit of the complainant, his wife, who occupies sub-

.stantially the position of an alleged fraudulent vendee of the property sought to be subjected, cannot interpose that defense.

On May 5, 1874, Henrietta Battle and others conveyed by deed to the defendant, Harriet W. Huger, wife of the defendant, Daniel E. Huger, the real estate described in the bill, consisting of a dwelling house and lot in the city of Mobile, for the consideration recited in the deed of one dollar, and the satisfaction of a mortgage to the executors of John A. Battle, deceased, the amount of which mortgage debt was $10,000. The defendants, Mr. and Mrs. Huger, went into immediate possession of the premises and have since occupied them as a residence and homestead. On November 9, 1882, the defendant, Daniel E. Huger, began purchasing goods of Charles Werborn, complainant's testator, and incurred indebtedness to him aggregating, Feb. 7, 1884, $1,163.30, on which the debtor made sundry payments entitling him to an aggregate credit of $550 leaving due, Feb. 7, 1884, $613.30. On the 17th day of December, 1889, Werborn reduced this demand to judgment, in the circuit court, in the sum of $900.78 and costs, and had execution thereon, which was returned, May 2, 1890, "no property found." On December 26, 1890, Chas. F. G. Peters, as administrator with the will annexed of Werborn, filed this bill, alleging, in substance, that said Daniel E. Huger, in fact, purchased and paid for said house and lot, and had the title conveyed to his said wife, with the actual intent to hinder, delay or defraud his creditors; that at the time of the purchase and payment he was insolvent; that the property was, and had always been, worth more than $2,000—the statutory exemption, —and praying to subject the excess of its value to the payment of said judgment. The answer puts in issue the alleged equity of the bill. It appears that, after the rendition of the final decree in the cause, the appellant, Richard W. Stoutz, was appointed administrator, with the will annexed, of Werborn's estate. He exhibited his letters to the register, and sued out the present appeal. The issue in the cause is purely one of fact; and the question for decision is whether the payments made by the husband, D. E. Huger, of the purchase money, were made, and the title caused to be conveyed to his wife, for the purpose of placing the property beyond the

reach of his creditors. The complainant being a subsequent creditor, the burden is upon him to prove the investment of the husband's funds in the purchase, with the fraudulent intent above mentioned. The defendant, Daniel E. Huger, was a cotton broker in the city of Mobile, living there with his wife, the said Harriet W. It appears from the judicial proceedings at law introduced in evidence by the complainant, that on May 29, 1871, A. P. Bush, in a proceeding by garnishment, wherein Leach Harrison and Forwood were defendants, recovered a judgment *nisi* against said D. E. Huger, which was made final on June 13. 1873, for $3,778.38. Execution was issued thereon July 4, 1873, and returned "no property found" January 2, 1874. An alias was issued August 28, 1877, and likewise returned October 16, 1877. On February 16, 1874, Leach Harrison and Forwood obtained judgment against him for $8,257.08 on a demand alleged in the complaint to have been contracted May 25, 1870. Execution was issued March 6, 1874, and returned July 3, 1874, "no property found." Probably, though it does not affirmatively appear by proof, the $3,778.38 recovered by Bush, on default of Huger, as garnishee, in fact, represents, in part, the said $8,257.08 recovered by Leach Harrison and Forwood. These judgments, it is observed, were prior to the purchase of the house and lot, the subject of this suit, and were in force at the time of that purchase. Subsequently, other judgments were obtained against him, viz : Mechanic's and Traders' Bank, May 25, 1877, $640, on which execution was issued July 21, 1877, and returned "no property found" Jan. 4, 1878; and Queen Insurance Company, June 6, 1888. for $1,175.40; execution June 21, 1888, returned "no property found" December 3, 1888. This is all the evidence touching Mr. Huger's financial condition at the time of the purchase and since, except that he testifies that his income after making the first payment on the house and lot, (which was at the time of the purchase) was not as much as it was before ; and that he had not, since then, made $7,000 over and above expenses. The purchase of the house and lot was negotiated entirely by said D. E. Huger, his wife, as she testifies, taking no part in it. The terms of payment were $3,000 in cash, at the time of the purchase; $2,000 to be paid at ten months ; $3,000 two years from date, and

the balance, $2,000, four years from date. Mr. Huger paid the cash payment of $3,000 with his own funds, and he and his wife executed their joint promissory notes for the said several payments, all bearing interest from date, the said D. E. Huger signing first. Except as to the last of these notes, it does not appear when they were paid, though they were all paid. Presumably, they were paid as they respectively fell due. The evidence shows that Mrs Huger procured Wm. Butler Duncan, of New York, to pay the last note, being the note for $2,000 payable four years after date—May 8, 1878,—which he did on Feb. 9, 1880, taking from the mortgagees in the Battle mortgage, an assignment of that instrument to himself, for his security. This money was repaid to Mr. Duncan by Mrs. Huger, Aug. 13, 1880. How she obtained the means to repay this loan, and by whom the first and second notes aggregating $5,000, besides interest, were paid, are contested questions. The complainant took no testimony. The defendants took and introduced the depositions of themselves and Mr. Duncan. The testimony of D. E. Huger touching these questions is, substantially, as follows : Responding to interrogatories in chief, he says : "I do not recollect when I bought the house I now live in. I bought it from the estate of S. G. Battle for $10,000. I agreed to pay $2,000 or $3,000 cash and the balance on time. I made the cash payment. My money was used in making the cash payment. After the first payment the other payments were made with monies of my own and William Butler Duncan of New York." Answering another direct interrogatory, he says : "I did not state that Mrs. Huger made the deferred payments herself, but she made them through William Butler Duncan. She made the money through Mr. Duncan. Mr. Duncan made the investments for Mrs. Huger. Mr. Duncan offered to lend me money to make the deferred payments, but I was under obligations to him already and refused to take any more money from him." Answering another interrogatory, he says : "I am not accurate as to dates. I think all the purchase money was paid for the house before Werborn's account was made. All I paid was before the account was made. I do not know how long before. I cannot give the date of each payment." Answering another interrogatory, he says : "I believe

the last payment on the house was made to E. H. Grandin, executor, by Mr. William Butler Duncan. I do not know the date Mr. Duncan paid this money, but I never paid him back." On cross-examination he was asked: "If you have answered that Hattie W. Huger borrowed money to make some of the payments upon said house, did she not repay such loans? Did not D. E. Huger furnish her with the means of repaying such loans? Did not the money to repay such loans come from D. E. Huger, either directly or indirectly? "Did not D. E. Huger in some way repay the party who made such loan or loans to Mrs. Hnger? To which he answered: "I cannot answer the first question to the second cross-interrogatory definitely. I think the money was lent to my wife first, and I think Mr. Duncan made the money for her in Mobile & Ohio Railroad debenture bonds. I did not furnish my wife with the means of repaying such loans directly or indirectly. I did not repay the party who loaned the money to Mrs. Huger." Answering another cross interrogatory, he says: "I do not know that any money was furnished my wife for speculation or investment. I have good reasons to believe that Mr. Duncan assisted her in his speculations. The investments were in bonds principally."

Mrs. Huger, answering an interrogatory in chief, says: "I think I bought the house I live in about eighteen years ago. Col. Huger made the contract of the purchase of my home. Col. Huger made all the negotiations for the purchase of the property." Again she answers: "My husband made the first payment. Through friends I made money by investment and speculation, and in that way made money to make the deferred payments. Friends made the investment or speculation by which I made this money." Again she answers: "My house was paid for as near as I remember, before this account was made. I can not state how long before. I cannot state accurately when the payments were paid on my house." Again she answers: "I cannot state when the last payment was made on my house. It must have been paid to E. H. Grandin. I repaid Mr. Duncan gradually." * * I have stated all I know about this matter. Answering a cross-interrogatory, she says: "I paid gradually on the money

[Stoutz, Admr., &c., v. Huger.]

that I borrowed to pay on my house. That is my best impression. Col. Huger did not furnish me with the money to repay such loans, either directly or indirectly. He did not repay these loans." Answering another cross-interrogatory, she says: "Mr. Duncan managed all my speculations or investments. I don't know how it was derived. I am perfectly ignorant how the speculation was managed. These speculations were managed by Mr. Duncan." The foregoing comprises the entire testimony of these two witnesses respecting the payments and how and by whom they were made.

Mr. Duncan testified for defendants as follows: "I know the house now owned and occupied by Mrs. Hattie W. Huger and family in Mobile. I had to do with the payment of the balance due by Mrs. H. W. Huger upon this property. I paid the last note due by Mrs. Huger upon that property. The amount so paid by me was two thousand dollars, and one hundred and eighty dollars of interest. I paid it on February 9th, 1880. I have examined Exhibit A, and find it is the note which I paid. I paid it to E. H. Grandin and R. T. Stannard, executors of J. A. M. Battle." Again he says: "I paid it (the note for two thousand dollars) February 9th, 1880. I was repaid the amount by Mrs. Huger August 13th, 1880." Again he says: Mrs. Huger said to me that the balance due by her on account of the purchase of this property, amounted to the remaining note unpaid, namely, $2,000, with interest; that she had not the means to pay said note; that she desired me to advance her the amount necessary. She did this with the knowledge of her husband, Daniel E. Huger, who said to me personally that he had not the means of doing so, and that if she could not manage to get the money to do it, the property would have to be sacrificed. He at that time owed me personally money, and stated to me he would not under any consideration ask me to advance any more to him, and that whatever I did in connection therewith, I must do at the request of Mrs. Huger, and upon her responsibility, as he had no money to give her, or to accomplish what she desired." Again he says: "It (the money he paid) was not derived from her husband, D. E. Huger, either directly or indirectly, and I know of no other source (from which Mrs. Huger derived the money), except the

[Stoutz, Admr., &c., v. Huger.]

extent that I personally assisted her therein.   *   *   *
I do not know what investments of money she may have
made.   I personally made an investment for her, ad-
vancing the whole amount thereof, on which I subse-
quently realized, giving her the benefit of the profit
exceeding the amount which I had advanced for her."
This constitutes substantially all the testimony
upon the question under consideration, an analysis of
which shows very plainly to our minds that Mr. Huger
paid all the purchase money for the house and lot, ex-
cept the last note for two thousand dollars paid by
Mr. Duncan; that Mr. Duncan, after making the pay-
ment, gave Mrs. Huger the benefit of some investment
he made in Mobile & Ohio Railroad bonds, and in that
way realized the money to repay himself the amount
he had paid out.

The next question then is, does the evidence satisfy
the mind that Mr. Huger had the title to this property
put in the name of his wife in order to place the proper-
ty beyond the reach of his creditors? We are pursuaded
that such was the purpose.   We have seen that on Feb.
16, 1874, about three months before the purchase, a
judgment was rendered against him for $8,257.08 on a
debt which he had been owing since May 25th, 1870,
upon which an execution was, at the time of the pur-
chase, in the hands of the sheriff; that previously, to-
wit, June 13th, 1873, a judgment had been obtained
against him for $3,778.38 upon which execution had
been returned Jan. 2d, 1874.   His business was evident-
ly declining, for he testified that his income was not so
much after the purchase as it was before.   It is not con-
ceivable that at the time of the purchase he did not re-
alize the existence, and feel the pressure, of the heavy
indebtedness then but recently reduced to judgment, and
in the hands of the sheriff for collection.   He engaged
in the purchase of a very valuable home, worth $8,000
more than the law allows a debtor to hold, as a home for
himself and family, against the claims of creditors, and
paid down, in the face of the judgment against him, the
sum of $3,000 of his own funds.   It cannot be denied
that it was contemplated by both himself and wife that
he would make the deferred payments, for it is not pre-
tended that she had any estate, was engaged in any bus-
iness or that she could, in any wise, anticipate the fu-

[Stoutz, Admr., &c., v. Huger.]

ture acquisition of means with which to make the payments as they might severally mature. This is borne out by the fact that he himself made the future payments, until he reached the last, due four years after the purchase. Finding himself unable to pay the last note, and two years after its maturity having passed, it is evident the time came that the property was about to be sacrificed, on account of his inability to raise the necessary amount. In this emergency, through the intercession of his wife, Mr. Duncan was induced to advance the money to pay the note, the history of which has already been stated. In view of all this he has the title to this valuable home placed in his wife, where, if the conveyance stands, the property would be secure to the use of himself and family, free from the judgments which were pending against him. Can this be deemed the exercise by a debtor of a due regard for the rights of his creditors? We are constrained to think that the course pursued was in that disregard of the rights of creditors which imparts to the transaction the element of *mala fides* which the law condemns as actually fraudulent.

The decree of the chancellor will be reversed, and a decree here rendered granting the complainant relief and ordering that, if his debt and the cost of this court and the court below be not paid by a day to be therein named, the said property be sold and the excess of the proceeds of sale over $2,000, representing the homestead right, and $2,180 with interest, the preferred lien of Mrs. Huger, be applied so far as necessary to the payment thereof; the said $2,000, and the amount of said preferred lien, and the surplus of the remainder after the payment of complainant's debt and cost, aforesaid, to be paid over to the defendant, Hattie W. Huger.

Reversed and rendered.